# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELIZABETH LAZARUS, Derivatively on Behalf of Nominal ACADIA PHARMACEUTICALS, INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| STEPHEN R. DAVIS, SRDJAN R. STANKOVIC, MICHAEL J. YANG, TODD S. YOUNG, TERRENCE O. MOORE, STEPHEN R. BIGGAR, JULIAN C. BAKER, LAURA A. BREGE, JAMES DALY, EDMUND P. HARRIGAN, and DANIEL B. SOLAND, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| ACADIA PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

Plaintiff Elizabeth Lazarus ("Plaintiff"), by and through her undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant Acadia Pharmaceuticals, Inc. ("Acadia" or the "Company"), against certain of the Company's officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (as defined below) violations of §10(b)

of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, breaches of fiduciary duties, unjust enrichment, and waste of corporate assets.  Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Acadia and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review of news articles, shareholder communications, and postings on Acadia's website; (c) review of the pleadings and other documents in the securities class action captioned *In re Acadia Pharmaceuticals, Inc.*, Case No. 18-cv-01647-AJB-BGS (the "Securities Class Action"); and (d) review of other publicly available information concerning Acadia and the Defendants. Plaintiff believes that through reasonable discovery, substantial additional evidence will exist for the allegations and claims set forth herein.

## SUMMARY OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant Acadia against certain of the Company's current and former executive officers and directors aiming to rectify Defendants' violations of the Exchange Act, and breaches of fiduciary duties for issuing false and misleading statements

and/or omitting material information in the Company's public filings from approximately April 29, 2016 through the present (the "Relevant Period").[1]

2.     Acadia is a biopharmaceutical company that purports to focus on the development and commercialization of medicines to address central nervous system disorders. The Company *first drug* is NUPLAZID (pimavanserin), which received approval by the U.S. Food and Drug Administration ("FDA") on April 29, 2016 for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis (or "PD Psychosis"). Though NUPLAZID is the only drug approved specifically for the purpose of treating PD Psychosis, there are off-label alternatives available.

3.     The Company launched NUPLAZID in the United States in May 2016. Prior to its commercialization of NUPLAZID, the Company did not earn any revenue from product sales.

4.     Touting the results from its Phase III clinical trial of NUPLAZID, Acadia has always marketed NUPLAZID as superior to alternatives prescribed off-label with claims that because "NUPLAZID is a selective serotonin inverse agonist, or SSIA, preferentially targeting 5-HT2A receptors," it is not only efficacious at reducing hallucinations and delusions associated with PD Psychosis

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately April 29, 2016 through January July 9, 2018; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient

but also "has the potential to avoid many of the debilitating side effects of existing antipsychotics." Defendants have consistently and emphatically represented that the drug is safe.

5.     In reality, clinical trial results demonstrated that patients treated with NUPLAZID as opposed to placebo suffered severe adverse events ("SAEs"), *including death,* at *double the rate*. Notably, both the drug group and placebo group had the same patient population--- there were no meaningful distinctions between the two groups based on age, gender, severity of illness or other factors that would account for the higher death rate in patients treated with NUPLAZID.

6.     The incidence of death in those treated with NUPLAZID was so high that Dr. Paul Andreason, a board-certified psychiatrist with more than 25 years of experience, and the primary reviewer for the FDA of Acadia's new drug application ("NDA") for NUPLAZID, issued a clinical review in September 2015 with a recommendation of "do not approve." Mr. Andreason made clear in his review that his recommendation not to approve was "due to an unacceptably increased, drug related, safety risk of mortality and serious morbidity."

7.     Thereafter, an Advisory Committee convened on March 29, 2016 to evaluate NUPLAZID and make a recommendation to the FDA regarding approval. Despite Mr. Andreason's scathing review of the drug, and despite stated concerns from multiple members of the Committee regarding the drug's safety profile, the

Advisory Committee voted 12-2 in favor of approval swayed substantially by the "unmet medical need" and lack of *approved* products to treat PD Psychosis. However, even those who voted in favor, did so with stated reservations.

8.     Post-commercialization the Company received mounting numbers of adverse event reports confirming Mr. Andreason and the Advisory Committee members' worst fears--- the astronomical death and adverse event rates suffered by patients treated with NUPLAZID during clinical testing manifested in real world usage as well. ***At no point during the Relevant Period did Acadia issue a press release revealing the surging number of adverse event reports nor did it reference the adverse event reports in any of its quarterly or annual filings with the SEC.***

9.     As Defendants well knew, and conceded in its Relevant Period SEC filings, this increased risk of death in patients taking NUPLAZID could cause physicians to refrain from prescribing the drug. Indeed, as Mr. Andreason confirmed in his medical review, while NUPLAZID would be the first *FDA approved* drug to treat PD Psychosis, it "*will not be the only or possibly the best or relatively safest drug to prescribe for the treatment of PDP.*" With no other products for sale, and no other drugs in the pipeline up for imminent FDA approval, Acadia desperately needed physicians to prescribe NUPLAZID to their

patients suffering with PD Psychosis rather than opt for potentially safer off-label alternatives.

10.    To that end, and unbeknownst to investors, Acadia began dispensing massive sums of money to doctors, couched as consulting or speaking fees, to incentivize prescription writing--a practice strictly prohibited by the False Claims Act and Anti-Kickback Statute. Defendants acknowledged their familiarity with the dictates of these regulations in SEC filings throughout the Relevant Period.

11.    These improper payments triggered a serious risk that the Company would face regulatory scrutiny for its questionable practices. Specifically, for the six months of 2016 following NUPLAZID's launch, Acadia spent $609,556 on consulting, speaking and travel and lodging payments with payments to individual doctors as large as $25,690 and $19,145. In 2017, the overall payouts skyrocketed. In 2017, Acadia paid more than $*8.6 million*, with 62 doctors receiving more than $50,000 apiece, and 26 receiving at least $100,000 each. For example, Acadia paid $180,123 to Dr. Neal Hermanowicz, an Irvine, California-based movement disorders specialist. Acadia also paid $166,259 to Dr. Jason Kellogg, a psychiatrist from Santa Ana, California. In addition to prescribing the drug, both Hermanowicz and Kellogg have spoken and written extensively promoting NUPLAZID.

12.    Many of the physicians who received Acadia "consulting fee" payments in 2016 and 2017 are the same individuals who prescribed NUPLAZID

with some frequency in 2016. Notably, in *2016*, 14 of the 25 doctors that most frequently prescribed NUPLAZID to patients covered by Medicaid Part D received "consulting fees" in *2017* worth more than $1.21 million in total.

13.   For example, Dr. Hermanowicz ranked #8 for prescriptions of NUPLAZID covered under Medicare Part D. Dr. David Keitzman, a neurologist from Commack, NY, received $14,203.38 from Acadia in 2016 and $154,988.18 in 2017. For 2016, Keitzman ranked #2 for prescriptions of NUPLAZID covered under Medicare Part D. Dr. Stuart Isaacson, a neurologist from Boca Raton, Florida, received payments of $3,250 from Acadia in 2016 and $154.560,04 in 2017. For 2016, Dr. Isaacson ranked #11 for prescriptions of NUPLAZID covered under Medicare Part D.

14.   Throughout the Relevant Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, including: (i) adverse events, safety concerns, and mounting reports of deaths related to NUPLAZID post-commercialization raised the risk that the FDA would reconsider its approval of the drug or, at minimum, that industry watchdogs would warn against prescribing the drug; (ii) as a result of NUPLAZID's deleterious safety profile and the availability of off-label alternatives, Acadia embarked on a campaign to pay off physicians to prescribe NUPLAZID; (iii) Acadia's reported net product sales throughout the Relevant Period therefore included sales

generated, at least in part, by undisclosed improper business practices rather than just from the acceptable business practices Defendants described publicly during the Relevant Period; and (iv) these improper business practices, in contravention of federal regulations, raised a risk that Acadia would face regulatory scrutiny.

15.    On February 27, 2018, Acadia announced fourth quarter 2017 NUPLAZID sales of $43.6 million, which was approximately $720,000 below consensus estimates.

16.    On this news, Acadia's stock price fell $6.24 per share, or 20%, to close at $24.92 per share on February 28, 2018, on unusually heavy trading volume.

17.    On April 9, 2018, CNN reported that "[p]hysicians, medical researchers and other experts told CNN that they worried that [NUPLAZID] had been approved too quickly, based on too little evidence that it was safe or effective. And given these mounting reports of deaths, they say that more needs to be done to assess Nuplazid's true risks."

18.    On this news, Acadia's stock price fell $5.03 per share, or 23.4%, to close at $16.50 per share on April 9, 2018, on unusually heavy trading volume.

19.    On April 25, 2018, CNN reported that the FDA was re-examining the safety of NUPLAZID.

20.     On this news, Acadia's stock price fell $4.27 per share, or 21.9%, to close at $15.20 per share on April 25, 2018, on unusually heavy trading volume.

21.     On July 9, 2018, the Southern Investigative Reporting Foundation ("SIRF") published a report entitled "Acadia Pharmaceuticals: This Is Not a Pharmaceuticals Company." Therein, SIRF stated that "evidence is mounting that something is horribly wrong with Acadia's sole drug, Nuplazid, an antipsychotic for Parkinson's disease patients who experience episodic hallucinations and delusions" and that "Acadia has accomplished its growth in ways that have attracted intense regulatory scrutiny for other drug companies" including "dispensing wads of cash to doctors to incentivize prescription writing and downplaying mounting reports of patient deaths."

22.     On this news, Acadia's stock price fell $1.21 per share, or 6.8%, to close at $16.63 per share on July 9, 2018, on unusually heavy trading volume.

23.     Following the Relevant Period, on November 28, 2018, the Company filed a prospectus supplement on Form 424B5. Buried within that filing, the Company included a single sentence revealing that *two months prior*, in September 2018, Acadia "received a civil investigative demand, or CID, from the DOJ pursuant to the Federal False Claims Act requesting certain documents and information related to our sales and marketing of NUPLAZID." The DOJ's investigation is still ongoing.

24.    Then, on March 27, 2019, the Institute for Safe Medication Practices ("ISMP") issued a report which called upon the FDA to reevaluate the drug, or at minimum, revise NUPLAZID's confusing black box warning.  Highlighting frightening safety signals, the ISMP noted that in the prior 12 months there had been 43,781 reports of patient deaths, a number that surpassed the number of deaths for all motor vehicle accidents in 2017 and twice as many as for all homicides.

25.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

27.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' participation in the wrongful acts detailed herein, occurred in this district.  One or more Defendants either resides in or maintains offices in this district, and Defendants

have received substantial compensation in this district by engaging in numerous improper activities detailed herein and conducting business here, which had a material effect in this district.

28.    This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

29.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein occurred in this District. Further, Acadia is incorporated in this District.

## THE PARTIES

### A.    Plaintiff

30.    Plaintiff has continuously been a shareholder throughout the period of the wrongdoings complained of herein, and is a current shareholder.

### B.    Nominal Defendant

31.    Nominal Defendant Acadia is a Delaware corporation with its principal executive offices located at 3611 Valley Centre Drive, Suite 300, San

Diego, California 92130.  Acadia's shares trade on the NASDAQ Stock Market under the ticker symbol "ACAD."

### C.   Defendants

32.   Defendant Stephen R. Davis ("Davis") is ACADIA's Chief Executive Officer and a director and has been since September 2015. Defendant Davis was also ACADIA's President from September 2015 to November 2018; Principal Financial Officer from November 2018 to March 2019 and from September 2015 to August 2016; Principal Accounting Officer from September 2015 to August 2016; Interim Chief Executive Officer from March 2015 to August 2015; and Executive Vice President, Chief Financial Officer and Chief Business Officer from July 2014 to August 2015. Defendant Davis is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Davis knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, public filings, and/or analyst conference calls. ACADIA paid defendant Davis the following compensation as an executive:

| YEAR | TOTAL COMPENSATION |
|:---:|:---:|
| 2019 | $7,631,245 |
| 2018 | $6,508,032 |
| 2017 | $15,158,146 |

| 2016 | $9,261,447 |

33.     Defendant Srdjan R. Stankovic ("Stankovic") is ACADIA's President and has been since November 2018. Defendant Stankovic was also ACADIA's Executive Vice President, Head of Research and Development from November 2015 to November 2018. Defendant Stankovic is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Stankovic knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, public filings, and/or analyst conference calls. ACADIA paid defendant Stankovic the following compensation as an executive:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $5,088,270 |
| 2018 | $5,678,381 |
| 2017 | $7,196,469 |
| 2016 | $2,743,218 |

34.     Defendant Michael J. Yang ("Yang") is ACADIA's Executive Vice President, Chief Commercial Officer and has been since March 2017. Defendant Yang is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Yang knowingly

or recklessly made improper statements in the Company's press releases, public filings, and/or analyst conference calls. ACADIA paid defendant Yang the following compensation as an executive:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2018 | $3,182,910 |
| 2017 | $12,103,948 |

35.    Defendant Todd S. Young ("Young") was ACADIA's Executive Vice President and Chief Financial Officer from August 2016 to October 2018. Defendant Young is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Young knew about, allowed, or approved the Defendant Young knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases, public filings, and/or analyst conference calls. ACADIA paid defendant Young the following compensation as an executive:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2018 | $1,386,333 |
| 2017 | $3,301,619 |
| 2016 | $4,696,543 |

36.     Defendant Terrence O. Moore ("Moore") was ACADIA's Executive Vice President and Chief Commercial Officer from August 2013 to March 2017. Defendant Moore is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Moore knew about, allowed, or approved the Defendant Moore knowingly or recklessly made improper statements in the Company's press releases, public filings, and/or analyst conference calls. ACADIA paid defendant Moore the following compensation as an executive:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2016 | $2,643,985 |

37.     Defendants Davis, Stankovic, Yang, and Young are collectively referred to herein as the "Executive Defendants."

38.     Defendant Stephen R. Biggar ("Biggar") is ACADIA's Chairman of the Board and has been since June 2016, and a director and has been since January 2013. Defendant Biggar knowingly or recklessly made improper statements in the Company's press releases and public filings. ACADIA paid defendant Biggar the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $ |

| | |
|---|---|
| 2018 | $276,284 |
| 2017 | $352,326 |
| 2016 | $442,194 |

39.    Defendant Julian C. Baker ("Baker") is an ACADIA director and has been since March 2015. Defendant Baker knowingly or recklessly made improper statements in the Company's press releases and public filings. ACADIA paid defendant Baker the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|---|---|
| 2019 | $274,959 |
| 2018 | $231,284 |
| 2017 | $307,326 |
| 2016 | $382,888 |

40.    Defendant Laura A. Brege ("Brege") is an ACADIA director and has been since May 2008. Defendant Brege is the Chair of ACADIA's Audit Committee and has been since at least April 2017, and a member of that committee and has been since at least April 2016. Defendant Brege knowingly or recklessly made improper statements in the Company's press releases and public filings. ACADIA paid defendant Brege the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|:---:|:---:|
| 2019 | $289,959 |
| 2018 | $793,629 |
| 2017 | $329,678 |
| 2016 | $381,388 |

41.     Defendant James Daly ("Daly") is an ACADIA director and has been since January 2016. Defendant Daly is a member of ACADIA's Audit Committee and has been since at least April 2017. Defendant Daly knowingly or recklessly made improper statements in the Company's press releases and public filings. ACADIA paid defendant Daly the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|:---:|:---:|
| 2019 | $392,439 |
| 2018 | $413,549 |
| 2017 | $576,146 |
| 2016 | $664,242 |

42.     Defendant Edmund P. Harrigan ("Harrigan") is an ACADIA director and has been since November 2015. Defendant Harrigan knowingly or recklessly made improper statements in the Company's press releases and public filings. ACADIA paid defendant Harrigan the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $372,439 |
| 2018 | $394,552 |
| 2017 | $556,446 |
| 2016 | $449,081 |

43.   Defendant Daniel B. Soland ("Soland") is an ACADIA director and has been since March 2015. Defendant Soland is a member of ACADIA's Audit Committee and has been since at least April 2017. Defendant Soland knowingly or recklessly made improper statements in the Company's press releases and public filings. ACADIA paid defendant Soland the following compensation as a director:

| YEAR | TOTAL COMPENSATION |
|------|--------------------|
| 2019 | $392,439 |
| 2018 | $412,567 |
| 2017 | $575,196 |
| 2016 | $382,138 |

44.   Defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland are collectively referred to herein as the "Director Defendants."

45.   The Director Defendants, together with the Executive Defendants, are collectively referred to herein as the Individual Defendants.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

46.    By reason of their positions as officers, directors, and/or fiduciaries of Acadia, and because of their ability to control the business and corporate affairs of Acadia, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Acadia in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Acadia and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

47.    Each director and officer of the Company owes to Acadia and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

48.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

## Audit Committee Duties

49.     Pursuant to the Audit Committee Charter of Acadia,[2] the purpose of the Audit Committee is to "act on behalf of the Company's Board in fulfilling the Board's oversight responsibilities with respect to: (i) the Company's corporate accounting, financial reporting processes, systems of internal accounting and financial controls, and audits of financial statements, (ii) the quality and integrity of the Company's financial statements and reports, and (iii) the qualifications, independence and performance of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report (the "Auditors") or performing other audit, review or attest services for the Company."

50.     In addition to these duties, the members of the Audit Committee are responsible for the following:

### B. Oversee Internal Controls and Risk Management

**1. Complaint Procedures.** Establish procedures, when and as required by applicable laws, rules and regulations, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters. Review such procedures as necessary from time to time.

**2. Internal Control Over Financial Reporting.** Discuss with management and the Auditors the scope, adequacy and

---

[2] Available at https://ir.acadia-pharm.com/static-files/d4134520-074c-4c80-8c33-a722c4b57921.

effectiveness of the Company's internal control over financial reporting.

**3. Financial Risk Assessment and Management.** Review and discuss with management the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures, including reviewing and/or implementing any guidelines and policies with respect to financial risk assessment and management adopted by the Company.

## C. Oversee Financial Reporting

**1. Accounting Principles and Policies.** Review and discuss with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices; alternative accounting policies available under GAAP that the Auditors have discussed with management, the ramifications of the use of such alternatives and the treatment preferred by the Auditors; the potential impact on the financial statements of regulatory and accounting initiatives; and any other significant reporting issues and judgments.

\*       \*       \*

**3. Management's Discussion and Analysis.** Review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission (the "SEC").

**4. Audited Financial Statements.** Upon completion of the annual audit, (i) review the Company's annual financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and (ii) recommend whether or not such financial statements should be so included.

**5. Quarterly Results.** Prior to public disclosure of quarterly financial information, review and discuss with management and the Auditors the results of the Auditors' review of the Company's quarterly financial statements proposed to be included in the Company's Quarterly Report on Form 10-Q to be filed with the SEC, or included in the Company's quarterly earnings release, and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States).

**6. Press Releases.** Review and discuss with management and the Auditors, as appropriate, earnings press releases, as well as financial information and earnings guidance, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The chairperson of the Committee may represent the entire Committee for purposes of this discussion.

51.     Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

52.     Additionally, the Individual Defendants, as officers and/or directors of Acadia, were and are all bound by the Company's Code of Business Conduct and Ethics (the "Code").  Specifically, it states the following:

ACADIA Pharmaceuticals Inc. (the "Company") is committed to maintaining the highest standards of business conduct and ethics. This Code of Business Conduct and Ethics (the "Code") reflects the business practices and principles of behavior that support this commitment. We expect every employee, officer and director to read

and understand this Code and its application to the performance of his or her responsibilities with the Company. References in this Code to employees are intended to cover officers and, as applicable, directors.

Officers and managers are expected to develop in employees a sense of commitment to the spirit, as well as the letter, of this Code. Managers are also expected to ensure that all employees and contractors conform to Code standards when working for or on behalf of the Company. The compliance environment within each manager's assigned area of responsibility will be a significant factor in evaluating the quality of that individual's performance.

*       *       *

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees are aware of and comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your manager or the Chief Compliance Officer (as provided in Section 16). Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including e-mails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

*       *       *

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. We rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures.

53.    Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same, or similar, duties on, among others, the Board as those set forth above.

## **Control, Access, and Authority**

54.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Acadia, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Acadia.

55.    Because of their advisory, executive, managerial, and directorial positions with Acadia, each of the Individual Defendants had access to adverse,

non-public information about the financial condition, operations, and improper representations of Acadia.

56.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Acadia, and was at all times acting within the course and scope of such agency.

## **Reasonable and Prudent Supervision**

57.     To discharge their duties, the officers and directors of Acadia were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Acadia were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Acadia conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Acadia was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

58.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Acadia and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Acadia, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Acadia, the absence of good faith on their part, and a reckless disregard for their duties to Acadia and its shareholders that the Individual

Defendants were aware or should have been aware posed a risk of serious injury to Acadia.

59.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

60.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws. As a result, Acadia has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

61.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial

prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

63.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

64.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing,

substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background

66.    Acadia is a biopharmaceutical company that purports to focus on the development and commercialization of medicines to address central nervous system disorders. The Company's only drug is NUPLAZID (pimavanserin), approved by the FDA on April 29, 2016 for the treatment of hallucinations and delusions associated with PD Psychosis. The Company launched NUPLAZID in the United States in May 2016. As Acadia's SEC filings make clear, "Net product sales consist of sales of NUPLAZID, our first and only commercial product to date."

### The FDA Approval Process for NUPLAZID

67.    Any new drug must be put through a series of clinical trials to prove its safety and efficacy before it can be marketed and sold in the U.S. This includes human clinical trials that proceed in three phases. Phase 3 studies, the final phase, "are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." See 21 C.F.R. § 312.21(c). Such studies are considerably more extensive than the preceding phases. Phase 3 studies

are large-scale trials, usually involving several hundred to several thousand subjects and are intended to gather the information necessary to provide an adequate basis for labeling the drug. See 21 C.F.R. § 312.21(c). The FDA considers all of the clinical trials results and nonclinical studies in determining whether to approve a drug for market. See 21 C.F.R. §§ 314.125(b), 314.126(a).

68.    NUPLAZID (aka Pimavanserin) was developed under IND 68,384 for the treatment of PD Psychosis. The clinical program consisted of four randomized, controlled trials for safety and efficacy, which utilized the Scale for the Assessment of Positive Symptoms (SAPS) as the primary efficacy variable. ***This scale failed to show a statistically significant improvement in psychosis symptoms in three of the trials.*** Following its first three failures, Acadia met with the FDA in April 2010 to discuss their clinical program and modifications of the design for a subsequent fourth pivotal trial. The resulting Phase III trial (ACP-103-020) was statistically positive.

69.    The trial was randomized, which means that after enrolling patients--- all of whom had to satisfy the same inclusion criteria to participate in the trial--- the patients were randomly allocated to either the drug group or the placebo group. The point of this is to ensure that differences in safety and efficacy results between the two groups can be attributed to the drug rather than to some distinction between the two groups based on age, gender, severity of illness, or other non-drug

related factor. Notably 11.6% of trial patients discontinued the trial, with twice the rate of discontinuation occurring in the drug group, mostly because of adverse events.

70.     Following the completion of this trial, Acadia again met with the FDA in 2013 to gain agreement that an NDA would be accepted for filing based on data from a single, strongly positive trial with supportive safety and efficacy data from their earlier trials. ***The FDA usually requires evidence of more than one positive, adequate, and well-controlled trial for drug approval.*** Then, Acadia received a "Breakthrough Therapy Designation" for NUPLAZID in August 2014, a designation created by Congress in 2012 to speed up the FDA's approval process for treatments targeting an "unmet medical need."

71.     NUPLAZID, therefore, did not need to meet the same rigorous requirements as other drugs seeking approval and skated through the FDA approval process with greater ease despite its deleterious risk profile.

72.     Acadia submitted a new drug application ("NDA") to the FDA on September 1, 2015.

73.     The incidence of death in those treated with NUPLAZID was so high that Dr. Paul Andreason, a board-certified psychiatrist with more than 25 years of experience, and the primary reviewer for the FDA of Acadia's new drug application ("NDA") for NUPLAZID, issued a clinical review in September 2015

with a recommendation of "do not approve." Mr. Andreason made clear in his review that his recommendation not to approve was "due to an unacceptably increased, drug related, safety risk of mortality and serious morbidity."

74.    Indeed, Mr. Andreason made clear in his review that:

> If pimavanserin is approved based only on the data in this NDA, then it will be the only drug approved for this use; however, ***pimavanserin will not be the only or possibly the best or relatively safest drug to prescribe for the treatment of PDP.*** If pimavanserin is approved based only on this data, then the market will reasonably assume that pimavanserin is at least safer than clozapine. This conclusion would be misleading…

75.    An Advisory Committee convened on March 29, 2016 to evaluate NUPLAZID and make a recommendation to the FDA regarding approval. Despite Mr. Andreason's scathing review of the drug, and despite stated concerns from multiple members of the Committee regarding the drug's safety profile, the Advisory Committee voted 12-2 in favor of approval swayed substantially by the "unmet medical need" and lack of approved products to treat PD Psychosis.

76.    Even those Committee members that voted "yes" did so with stated reservations, including that the side effects are "concerning," and "the benefit is not as great as I would have liked," "I think the concern about safety is real," "I voted yes with some reservations," "If there were a safe and effective alternative on the market, I would not have voted yes," "definitely have some concerns about the safety," "I voted yes with the plea to the FDA to please consider a large

observational study so we can ensure that once it goes into real-world use, that the benefits will outweigh the risks," and "So I will summarize now. I would say that even the people that voted yes did so with qualifications. There's concerns about the safety…"

77.     The FDA accepted the Committee's recommendation and approved NUPLAZID the following month. While NUPLAZID contains a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs, the warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs and that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia.

78.     Acadia commercially launched NUPLAZID on May 31, 2016.

**Federal Regulations and Acadia's Improper Payments to Physicians**

79.     While Acadia may have been highly motivated to do everything necessary to increase sales and revenues, numerous federal and state laws and regulations, as well as industry ethical guidelines, restrict the Company's ability to adopt certain practices in the sales and marketing of and billing for its products and services. While some of these sales and marketing practices may be commonly accepted and legal in many types of businesses, pharmaceuticals are unique because certain government programs, such as Medicare and Medicaid, depend on

physicians and healthcare professionals to exercise independent judgment in the best interests of the patient. Thus, as explained by the Office of the Inspector General ("OIG"), the purpose of these laws and regulations is "to protect patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions."

80.    Specifically, in 1972, Congress enacted the Federal Anti-Kickback Statute to address concerns regarding conflicts of interest and unfair competition, which lead to abuses of federal health care programs. The Anti-Kickback Statute provides, in pertinent part:

> "Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both."

42 U.S.C. § 1320a-7b(b).

81.    In addition to criminal and civil fines and penalties, including up to five years in prison, violation of the Anti-Kickback Statute can also result in exclusion from participating in and receiving reimbursement from state and federal healthcare programs.

82.　This is particularly relevant to Acadia given that throughout the Relevant Period, Acadia represented that for prescriptions of NUPLAZID, two-thirds are under Medicare Part D plans, almost a third commercial and the remainder covered under Medicaid.

83.　Speaking about the Anti-Kickback Statute, the OIG warned that:

> *"Also of concern are compensation relationships with physicians for services connected directly or indirectly to a manufacturer's marketing and sales activities, such as speaking, certain research, or preceptor or 'shadowing' services . . . In particular, the use of health care professionals for marketing purposes––including, for example, ghost-written papers or speeches––implicate the anti-kickback statute."*

84.　With respect to "business courtesies and other gratuities," the OIG warned that entertainment, recreation, travel, meals, gifts, gratuities, and other business courtesies implicate the Anti-Kickback Statute if given to physicians in a position to make or influence referrals or *if any one purpose is to generate business for the company.*

85.　Similarly, consulting arrangements also may implicate the Anti-Kickback Statute. Although the Anti-Kickback Statute contains certain "safe harbors" for certain business arrangements, strict adherence with all applicable conditions set out in the relevant safe harbor is required in order to ensure compliance with the law. Among other things, compensation paid to consultants

must be reasonable and must not be tied to the volume of business generated or the value of referrals.

86.     Furthermore, under the Federal False Claims Act, the government may recover losses due to fraud and abuse by persons seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong., 2d Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N 5266. The False Claims Act makes it unlawful for any person to knowingly present a false or fraudulent claim, record or statement to the government for payment or approval. *See* 31 U.S.C. § 3729. With respect to Medicare and Medicaid, claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed. Medicare and Medicaid coverage is also limited to medical goods and services that are "reasonable and necessary" for the diagnosis and treatment of a patient. *See* 42 U.S.C. § 1395y(a)(1)(A).

87.     Regulatory scrutiny of the medical industry also increased with the enactment of the Physician Payments Sunshine Act of 2009 and the Patient and Affordable Care Act in 2010 ("PPACA"). These laws broaden the scope of the Anti-Kickback Statute and False Claims Act and require companies to report all transfers of value to physicians to the U.S. Department of Health and Human Services on an annual basis beginning March 31, 2013.

88.    With the enactment of the PPACA in 2010, ***violations of the Anti-Kickback Statute are per se violations of the False Claims Act.*** Specifically, the PPACA changed the language of the Anti-Kickback Statute to provide that claims submitted in violation of the statute automatically constitute false claims for purposes of the False Claims Act.

89.    Congress also added a new section that eliminates the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. See 42 U.S.C. §1320a-7b(h). Under the PPACA, even an unwitting and non-benefitting party within the stream of a reimbursement claim to Medicare or Medicare is liable for fraud if unlawful kickbacks taint any part of the claim.

90.    As stated in Acadia's Relevant Period SEC filings, Defendants understood that they were, "subject to state and federal laws, including, among others, anti-kickback laws, false claims laws, data privacy and security laws, and transparency laws that restrict certain business practices in the pharmaceutical industry." Defendants demonstrated their awareness and understanding of applicable regulations by explaining:

> The Anti-Kickback Statute "makes it illegal for any person or entity to knowingly and willfully, directly or indirectly, solicit, receive, offer, or pay any remuneration that is in exchange for or to induce the referral of business, including the purchase, order, lease of any good, facility, item or service for which payment may be made under a federal healthcare program, such as Medicare or Medicaid. The term

"remuneration" has been broadly interpreted to include anything of value."

\*       \*       \*

"federal false claims and false statement laws, including the federal civil False Claims Act, prohibits, among other things, any person or entity from knowingly presenting, or causing to be presented, for payment to, or approval by, federal programs, including Medicare and Medicaid, claims for items or services, including drugs, that are false or fraudulent…"

91.   Acadia further acknowledged its understanding throughout the Relevant Period that "a violation of the U.S. federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act."

### Acadia Dispenses Payouts to Physicians Prescribing NUPLAZID

92.   Despite the potentially serious repercussions, Defendants employed practices that exposed the Company to liability and enforcement under healthcare fraud and abuse laws, including, inter alia, the Anti-Kickback Statute and the False Claims Act

93.   As Acadia conceded in its Relevant Period SEC filings, the increased risk of death and adverse events in patients taking NUPLAZID could cause physicians to refrain from prescribing the drug. With no other approved products on the market providing a potential source of product revenue, Acadia needed physicians to prescribe NUPLAZID. Defendants therefore began dispensing

massive sums of money to doctors to incentivize prescription writing while downplaying mounting reports of patient deaths.

94.    For example, for the six months of 2016 that followed NUPLAZID's launch, Acadia spent $609,556 on consulting, speaking and travel and lodging payments to 1,578 doctors: The largest payouts went to Dr. Leslie Citrome, a New York based psychiatrist, in the amount of $25,690 and Dr. Khashayar Dashtipour, a California based neurologist, for $19,145.

95.    In 2017, the overall payouts grew substantially. In 2017, Acadia paid more than $8.6 million to 7,051 physicians, with 62 doctors receiving more than $50,000 apiece, and 26 receiving at least $100,000 each. For example, Acadia paid $180,123 to Dr. Neal Hermanowicz, an Irvine, California-based movement disorders specialist. In 2016, Dr. Hermanowicz received $10,421 from Acadia. Hermanowicz has spoken and written extensively regarding the advantages of NUPLAZID. Indeed, even before NUPLAZID received its approval, Dr. Hermanowicz authored a journal article in the *Expert Review of Neurotherapeutics* hyping the drug and was quoted in a MedPage Today article in June 2015 touting the efficacy of the drug and characterizing its offlabel competitors as coming "with a lot of baggage in the form of side effects." Dr. Hermanowicz also authored an article published in *Neurology Times* regarding NUPLAZID on May 29, 2018.

96.     Acadia also paid $166,259 to Dr. Jason Kellogg, a psychiatrist from Santa Ana, California. Kellogg has also spoken and written extensively about NUPLAZID, including in an article in "Today's Geriatric Medicine," entitled *New Drug Shows Promise in Treating Parkinson's Disease Psychosis*, where Kellogg is quoted as saying:

> Nuplazid treats psychosis-related symptoms in PD without producing any type of dopamine blockade. Because this medication has zero dopamine affinity, it's ideal for PD patients because they already have low levels of dopamine, he says.
>
> In the clinical trial, the medication was effective at reducing delusions and hallucinations, and an open-label extension of the trial was also conducted, Kellogg says. "What we learned is that there was durability of effect, and it was appearing that over time the delusions were coming down, albeit at a slower rate, but they were still coming down. So we won't need a lot of addon therapy with this particular medication."

97.     In an article published in the San Diego Business Journal on May 5, 2016, Kellogg lauds NUPLAZID and states, ""Patients have been waiting forever for a treatment like this to surface," said Dr. Jason Kellogg, a physician and psychiatrist who has been treating mental illness for over a decade." Kellogg is also quoted in an article entitled, "New Drug Offers Hope For Patients Suffering From Parkinson's Psychosis," published on May 12, 2016 in *Provider* magazine:

> "Using existing therapies to manage PDP is like trying to go north and south at the same time," says Jason Kellogg, MD, chief of staff at Newport Bay Hospital, Newport Beach, Calif., and a specialist in treating individuals with PDP in long term care settings. "Current antipsychotics will make the physical symptoms worse. It's a real

innovation to finally have a medication that will improve the delusions and not worsen the motor function of Parkinson's patients."

98.    Many of the physicians who received Acadia "consulting fee" payments in 2016 and 2017 are the same individuals who prescribed NUPLAZID with some frequency in 2016. Notably, in 2016, 14 of the 25 doctors that most frequently prescribed NUPLAZID to patients covered by Medicaid Part D received "consulting fees" in 2017 worth more than $1.21 million in total.

99.    For example, Dr. Hermanowicz ranked #8 for prescriptions of NUPLAZID covered under Medicare Part D. Dr. David Keitzman, a neurologist from Commack, NY, received $14,203.38 from Acadia in 2016 and $154,988.18 in 2017. For 2016, Keitzman ranked #2 for prescriptions of NUPLAZID covered under Medicare Part D. Dr. Stuart Isaacson, a neurologist from Boca Raton, Florida, received payments of $3,250 from Acadia in 2016 and $154.560,04 in 2017. For 2016, Dr. Isaacson ranked #11 for prescriptions of NUPLAZID covered under Medicare Part D.

**Materially False and Misleading Statements Issued During the Relevant Period**

100.   The Relevant Period begins on April 29, 2016 when Acadia issues a press release touting the FDA's approval of NUPLAZID, entitled "FDA Approves Acadia Pharmaceuticals' NUPLAZID™ (pimavanserin) - The First Drug Approved for the Treatment of Hallucinations and Delusions Associated with

Parkinson's Disease Psychosis." Therein, the Company emphasized that the FDA based its approval on Phase III Study data supporting both efficacy and safety. Specifically, the press release stated in relevant part:

> The FDA approval of NUPLAZID was based on data from the pivotal Phase III Study -020 and other supportive studies, representing the largest research and development program in Parkinson's disease psychosis to date. In Study -020, NUPLAZID significantly reduced the frequency and severity of psychotic symptoms compared to placebo on the Scale for Assessment of Positive Symptoms – Parkinson's Disease (SAPS-PD). This benefit was achieved without impairing motor function. The most common adverse reactions (≥5% and twice the rate of placebo) in this study were peripheral edema (7% NUPLAZID vs 3% placebo) and confusional state (6% NUPLAZID vs 3% placebo).

101.   The foregoing statements were false and misleading because, while hyping that NUPLAZID did not impair motor function, and describing "the most common adverse reactions," the Company did not make clear that patients treated with NUPLAZID during the Phase III trial died at twice the rate of patients treated with placebo; that this troubling safety profile caused the physician that led the FDA's review of NUPLAZID to recommend against its approval; and that, with safer "off-label" alternatives available, Defendants had to engage in improper business practices, including sizable payouts, to convince physicians to prescribe NUPLAZID, which raised a risk of regulatory scrutiny.

102.   On a May 2, 2016 analyst conference call to discuss the FDA's approval of NUPLAZID, Defendant Davis stated in relevant part:

> The unique pharmacology of NUPLAZID establishes a new class of drug, selective serotonin inverse agonists, or SSIA, by not only preferentially targeting 5-HT2A receptors, but also avoiding activity at dopamine and other receptors commonly targeted by antipsychotics. With this novel mechanism NUPLAZID significantly reduces the hallucinations and delusions in patients with PDP and, importantly, does so without impairing motor function.

While touting the "unique pharmacology" of NUPLAZID because it purportedly reduces hallucinations without impairing motor function, Defendants misled the market by not simultaneously revealing that NUPLAZID had a death rate so high that they would need to entice doctors with sizable payoffs to prescribe the drug to their patients.

103.   Later, on the same call, Defendant Stankovic stated in relevant part:

> The approval was based on the compelling data from our Phase 3 study 020, and other supported studies

> \*          \*          \*

> Notably, 65% of patients taking NUPLAZID experienced a three-point or greater improvement on the SAPS-PD scale, compared to 42% on placebo. Around 14% of patients taking NUPLAZID achieved a complete response or a full resolution of their PD psychosis symptoms on the SAPS-PD scale compared to 1% on placebo. Importantly, due to NUPLAZID's novel and unique mechanism of action this benefit was achieved without impacting motor function, an additional important feature prominently described in the label.

> Let me now turn to key safety information described in the NUPLAZID label. Similar to all other antipsychotics, NUPLAZID was approved with a class label box warning noting that elderly patients with dementia related psychosis treated with antipsychotic drugs are at an increased risk of death.

When covering safety comparisons observed between the drug and placebo groups during the trial, Defendant Stankovic omitted mention of the death rates entirely, stating that, "In regards to adverse events, the most common adverse reaction, defined as greater than or equal to 5% and twice the rate of placebo, included in the label were peripheral edema and confusional state." This statement was false and misleading because, in fact, patients treated with NUPLAZID also died at twice the rate of those treated with placebo. Stankovic also failed to reveal that because of NUPLAZID's terrible safety profile, the Company engaged in business practices that raised a risk of regulatory scrutiny.

104. Next, Defendant Moore described Acadia's plan to successfully commercialize and launch NUPLAZID, and to convince physicians to prescribe NUPLAZID to their patients.

> So, what I would like to do now over the next few minutes is walk you through some of our commercial thinking regarding the launch and why we are confident NUPLAZID over time should become the standard of care for patients with hallucinations and delusions associated with PDP. As you know, new products require market education. As with any new medicine, especially one with a novel mechanism of action and in a disease where there has been no approved therapy we will need to increase awareness and education among the community about the availability and the appropriate use of NUPLAZID.

> Among PD patients, the frequency of doctor visits varies from monthly to every six months. This likely will impact the opportunity to initiate therapy for potential NUPLAZID patients. Many physicians may want to see how NUPLAZID works on one or two of their

patients to gather first-hand experience with the product. As they get comfortable with NUPLAZID, we expect that usage should increase and that the number of patients on drug will likely build over time.

We believe we have a well-designed plan for systematically reaching out and reach the approximately 11,000 key physicians we have identified as PDP treating physicians. In fact, last Monday we onboarded 132 new employees as neuroscience sales specialists who are currently undergoing training. As was the case with the field management team we hired in March of 2015, this truly is an impressive group.

In the process of recruiting and hiring these folks we received over 9,000 applications and conducted 4,300 interviews to find our U.S.-based specialists. Coming out of the gate with a new product it is important to note that our field team experience averages 15 years in the pharmaceutical industry detailing products and their CNS expense on average is eight years. I can tell you, I'm delighted to have such an experienced and seasoned team calling on physicians to educate them on the benefits of NUPLAZID and the impact it can have on patients and their families. They will be well prepared for the launch of NUPLAZID in their territories in June.

With our compelling data NUPLAZID will complement these direct educational efforts with a variety of multi-channel education activities that will help drive awareness of PDP and NUPLAZID. And I'm pleased to report that all of our commercial activities are on track and we are now poised for a June launch.

Later in the call, in response to analyst questions, Defendant Davis similarly described commercialization efforts involving the 132 representatives hired to target physicians, as well as an extensive sampling program for physicians to "see firsthand how the drug works in their hands." In describing these commercialization efforts, Defendants Moore and Davis glaringly failed to reveal that the lynchpin of their successful commercialization plan included sizable

payments to physicians to motivate them to prescribe NUPLAZID despite the astronomical death rate, and that these payments raised a risk that Acadia would face regulatory scrutiny.

105. Indeed, far from revealing the difficulty in convincing physicians to prescribe a product with a high death rate, especially given its questionable efficacy, Defendant Moore speciously represented on the call that "the ability to educate physicians may be just a little bit easier because they are eager for a solution."

106. Moreover, while declining to provide "quantitative guidance" on this call, Defendant Davis described the key components of Acadia's gross to net adjustments:

> … while we won't be providing quantitative guidance at this time on gross to net adjustments, I can describe the key components of what will be included in these adjustments. And they include, fees paid to our specialty pharmacies and distributors; rebates and charge backs associated with government programs including our share of the doughnut hole for Medicare Part D patients; patient assistance to eligible privately insured patients; and any product returns.

Defendant Davis misleadingly did not include payouts to physicians as inducement to prescribe NUPLAZID in its list of "gross to net adjustments."

107. The following day, on May 3, 2016, a mere four days after announcing the FDA's approval of Acadia's first drug, Acadia filed a Form 8-K

with the SEC announcing that three members of its Board of Directors were leaving—two having opted not to run for re-election, and one having resigned.

108. On May 5, 2016, Acadia hosted an analyst call to discuss its first quarter results for 2016. On that call, Defendant Davis repeated prior representations regarding NUPLAZID's purported advantage of reducing hallucinations and delusions while "not impairing motor function in PDP patients," without any mention of the excessively high death rate for patients treated with NUPLAZID during the Phase III trial. Moreover, Davis once again stated that, "[k]ey priorities for a successful launch will be to educate healthcare providers on NUPLAZID, ensure patient access to NUPLAZID and work with payers to secure reimbursement," without also revealing Acadia's payouts to doctors to motivate them to prescribe NULAZID despite its deleterious safety profile. Indeed, far from detailing the troubling death rate and its resulting consequence on Acadia's commercialization efforts, Defendant Davis portrayed the drug's safety profile as positive and pointed to the "favorable safety profile" as a consideration in pricing the drug:

> And we also felt like it was important to consider the safety and tolerability profile of the drug. We think it has a very overall favorable safety profile and tolerability profile and we thought that was an important consideration.

109. Defendant Moore similarly touted NUPLAZID as compared to off-label alternatives, stating, "For the first time, physicians can treat the hallucinations

and delusions associated with PDP without impairing motor function." Defendant Moore also repeated the statements regarding physician education and commercialization efforts set forth herein.

110. Additionally, in response to an analyst question, Defendant Moore described Defendants' plan to get physicians to prescribe NUPLAZID:

> Well, our market message revolves around our indication and the benefits we provide and it's up to the physician to decide, but clearly we have advantages over existing therapies and there are good reasons for physicians to consider switching their patients. So we're going to go out, we're going to show the benefits and we're going to help guide the physician in seeing why NUPLAZID would be their best choice.

Moore's did not reveal that improper payments in contravention of federal regulations were included in the "market message" Acadia used to provide "good reasons for physicians to consider switching their patients" and to "guide the physician" to prescribe a dangerous drug like NUPLAZID, and that such machinations created an untenable risk of regulatory scrutiny.

111. On May 31, 2016, Acadia issued a press release entitled "Acadia Pharmaceuticals Announces NUPLAZID™ (pimavanserin) Is Now Available for the Treatment of Hallucinations and Delusions Associated with Parkinson's Disease Psychosis." Therein, the Company once again hyped the drug and lauded its safety as compared to off-label alternatives Parkinson's disease therapy. Specifically, the press release stated, in relevant part:

NUPLAZID is also the only drug approved by the FDA that preferentially targets 5-HT2A receptors. These receptors are thought to play an important role in Parkinson's disease psychosis. The unique pharmacology of NUPLAZID establishes a new class of drug - selective serotonin inverse agonists (SSIA) - by not only preferentially targeting 5-HT2Areceptors but also avoiding activity at dopamine and other receptors commonly targeted by antipsychotics. Typical Parkinson's disease therapy consists of drugs that stimulate dopamine to treat patients' motor symptoms such as tremor, muscle rigidity and difficulty with walking. NUPLAZID does not interfere with patients' dopaminergic therapy and therefore does not impair their motor function.

112.   On July 29, 2016, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Second Quarter 2016 Financial Results." Therein, the Company reported on the approval of NUPLAZID and commercialization efforts to date. The press release explained that, "we are expanding awareness of NUPLAZID among healthcare professionals through a number of initiatives including speaker programs, media and digital campaigns, and symposia at major medical meetings; and we are working with payors to make NUPLAZID available to eligible patients." However, Defendants did not explain that, due to NUPLAZID's troubling death rate, their commercialization efforts included business practices likely to attract regulatory scrutiny, such as payments to physicians to motivate them to prescribe NUPLAZID over potentially safer off-label alternatives.

113.   Demonstrating the criticality of NUPLAZID to Acadia's bottom line, the Company admitted in the press release that while it reported net product sales

of $97,000 for the three months ended June 30, 2016, it had "no similar net product sales… for the comparable period of 2015" prior to NUPLAZID's approval and commercialization. The Company did not reveal that it generated product sales by paying off physicians to induce them to prescribe NUPLAID to their patients.

114.   On August 4, 2016, Acadia filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2016. The Company's 10-Q was signed by Defendant Davis and reaffirmed the financial results announced in the press release issued on July 29, 2016, including net product sales. Moreover, the Company indicated in the filing that NUPLAZID contained a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs. The warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia, and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID.

115.   That same day, Acadia hosted an analyst conference call to discuss the quarterly results, and NUPLAZID's recent May 31, 2016 launch. On the call, Defendant Davis repeated the net product sales results and detailed expenses incurred. Moreover, Defendant Davis stated that, "[o]perationally, the launch of NUPLAZID has gone very well and we are executing on ***our plans to bring***

*NUPLAZID to patients in need.*" Davis went on to discuss those plans in great detail, covering initiatives such as on boarding and training sales specialists, Acadia's NUPLAZID connection patient and physician support system, speaker program and digital and media campaigns, "a strong presence at medical meetings with product symposia at the American Psychiatric Association Annual Meeting held in mid-May and at the 20th International Congress of Parkinson's Disease and Movement Disorders held in mid-June," and hosting a NUPLAZID national broadcast webinar featuring experts in the field of PD psychosis. Davis emphasized that, "*our key commercial priorities are to broaden awareness in NUPLAZID* to ensure patient access and work with payers to secure reimbursement." Defendant Moore similarly provided a comprehensive report on commercialization efforts, echoing many statements he made on previous conference calls, and further stating that "*we are executing on a commercialization plan that is focused on broadening awareness of NUPLAZID, ensuring patient access and achieving broad coverage… It's a matter of getting the right message to the right physician with the right amount of frequency.*"

116.  Moreover, during the call an analyst asked whether "physicians and patients are happy with the efficacy or safety profile," in response to which Defendant Davis stated:

> Yes… based upon the anecdotes that we have had and frankly based upon all the data that we are evaluating, we are very pleased to see it

appears both on the side effects and tolerance side as well as on the efficacy side, everything is supportive of the profile that we – that the drug demonstrated in clinical trials. That's not always the case. So that's very helpful and the anecdotes have been very consistent with the kind of anecdotes that we had and the kind of experience we had in the clinic.

117.   On November 7, 2016, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Third Quarter 2016 Financial Results." Therein, the Company, once again spoke about the launch of NUPLAZID and focused on market reaction to the drug:

> "We are very pleased with the launch and are gratified by the positive feedback we have received from physicians, patients, and caregivers on NUPLAZID (pimavanserin)," said Steve Davis, Acadia's President and Chief Executive Officer. "We saw solid month-over-month prescription growth, reported increased payor coverage, and continued to expand awareness of NUPLAZID among movement disorder specialists, neurologists, and psychiatrists."
>
> *       *       *
>
> Acadia reported net product sales of $5.3 million for the three months ended September 30, 2016. No similar net product sales were reported for the comparable period of 2015.

118.   On November 7, 2016, Acadia filed its quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2016. The Company's 10-Q was signed by Defendant Young and reaffirmed the financial results announced in the press release issued on November 7, 2016. Moreover, the Company indicated in the filing that NUPLAZID contained a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis

treated with antipsychotic drugs. The warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia, and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID.

119. That same day, Acadia held an analyst earnings call to discuss the third quarter 2016 results. On the call, Defendant Davis reiterated the net product sales results and touted commercialization efforts without revealing improper payments to physicians to induce prescriptions of NUPLAZID, which contributed to net product sales. Specifically, Defendant Davis stated, in part:

> …our sales specialists have made excellent inroads in broadening and deepening awareness of NUPLAZID and are getting good access to physicians, including neurologists and psychiatrists.
>
> Through our market research and feedback from our sales specialists we have received strong positive feedback from physicians, who have prescribed NUPLAZID and about their intent to prescribe in the future.
>
> \*     \*     \*
>
> We see steady rates with new patient startings and continuing growth in the number of prescribing physicians and patients on NUPLAZID.
>
> \*     \*     \*
>
> The safety and tolerability profile was consistent with what we observed in the clinical studies, and on the efficacy front we are hearing from physicians that they are very pleased with the efficacy of NUPLAZID.

Later on the call, Defendant Moore stated, "I'm especially pleased to report that we are seeing steady adoption by physicians with consistent additions of new [writers] each week through the launch…" and that "In addition, our messages are resonating with physicians."

120.    On the same call, Defendant Young also highlighted the generation of $5.3 million in net product sales and described gross to net adjustments as including "fees paid to specialty pharmacies and specialty distributors, rebates and chargebacks associated with government programs, including our share of the donut hole for Medicare Part D patients, patient assistance to eligible privately insured patients and any product returns." Defendant Young also detailed the "expense side of the P&L." At no point in discussing these results did Young reveal the cost of paying off physicians to prescribe NUPLAZID despite its extremely high death rate.

121.    On February 28, 2017, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Financial Results for the Fourth Quarter and Year Ended December 31, 2016." Therein, the Company repeated prior representations regarding NUPLAZID and its commercial launch. The Company also reported net product sales of $12.0 million for the fourth quarter of 2016 and made clear that there were no similar product sales for the comparable quarter of 2015."

122.   The foregoing statements were false and misleading because they did not explain that included in the net product sales number were prescriptions generated due to improper payouts to physicians, not simply from acceptable commercialization activities, which raised a risk the Company would face regulatory scrutiny.

123.   On February 28, 2017, Acadia filed its annual report with the SEC on Form 10-K for the year ended December 31, 2016. The Company's 10-K was signed by Defendant Davis and reaffirmed the financial results announced in the press release issued on February 28, 2017, including net product sales. Moreover, the Company indicated in the filing that NUPLAZID contained a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs. The warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia, and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID.

124.   That same day, the Company held a conference call for analysts on which Defendant Davis touted the "strong progress of the launch" and stated, "During the quarter, we continue to observe a steadily growing number of patients starting therapy, together with the growing number of prescribers including repeat

prescribers." Davis further stated, "we've received favorable feedback from physicians on the clinical profile of NUPLAZID including its efficacy and favorable safety profile..." Defendant Young discussed net product sales and related expenses. Defendant Moore hyped NUPLAZID's commercialization success without mentioning the improper inducement payments to physicians in contravention of federal regulations, stating:

> we have had a strong introduction of NUPLAZID into the marketplace and are pleased by the solid uptake we saw in our second full-quarter commercialization. The use of NUPLAZID increased across all targeted segments with regular adaption occurring among movement disorder specialists. This was expected given the high density of PD psychosis patients these additions treat.

> *     *     *

> Currently, NUPLAZID prescriptions are approximately 70% switches from current therapy and approximately 30% are treatment of naïve patients.

> *     *     *

> Another crucial initiative will be educating key prescribers on the benefits of NUPLAZID and differentiating NUPLAZID based on improvement efficacy without impact-to-motor symptoms and a favorable safety and tolerability profile in frail elderly patients.

125. On May 9, 2017, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports First Quarter 2017 Financial Results." Therein, the Company, in relevant part, stated:

> "We're very pleased with our strong start to 2017," said Steve Davis, Acadia's President and Chief Executive Officer. "The use of

> NUPLAZID® in Parkinson's disease psychosis continues to expand as brand awareness among neurologists, psychiatrists, and other healthcare providers grows.

The Company reported net product sales of $15.3 million for the quarter.

126.   On May 9, 2017, Acadia also filed its quarterly report with the SEC on Form 10-Q for the quarter ended March 31, 2017. The Company's 10-Q was signed by Defendant Young and reaffirmed the financial results announced in the press release issued on May 9, 2017, including net product sales. Moreover, the Company indicated in the filing that NUPLAZID contained a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs. The warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia, and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID.

127.   Also, on May 9, 2017, the Company held a conference call during which Defendant Young reiterated the reported financials including net product sales and expenses without revealing that net product sales had been generated in part, by paying off physicians to prescribe NUPLAZID. Moreover, Defendant Davis stated:

> Our first quarter results reflect continued solid execution of our growth strategy for the NUPLAZID. Net sales rose to $15.3 million.

\*     \*     \*

During the quarter, we continue to see an increase in new prescribers and patients and an increase in the number of repeat prescribers.

\*     \*     \*

[W]e continue to observe strong foundational elements that support NUPLAZID's growth and its potential to grow attractively in the quarters and years to come.

Davis also stated on the call that, "The drug has performed almost exactly the same in the marketplace as we expected based upon the clinical profile of the drug. Same on efficacy, same on side effect and tolerability profile." Indeed, Defendant Davis spoke about physicians that Acadia is "actively seeking to influence… to use NUPLAZID" but described such influences as, "it's really the safety and efficacy and the performance of the product thus far… a majority of physicians in this case are satisfied, so there's a high satisfaction, a high intent to use because of the product is performing exact as the way it was promised" rather than divulging that such "influence" included improper payments that triggered a risk of regulatory scrutiny.

128.   Also, on the call, further describing NUPLAZID's growth, Defendant Yang stated that, "Importantly, 88% of the physicians surveyed who are aware of NUPLAZID intend to increase their future use for PD Psychosis."

129.  On August 8, 2017, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Second Quarter 2017 Financial Results." Therein, the Company once again discussed commercialization efforts and announced that it had generated $30.5 million of net product sales of NUPLAZID. The same day, Acadia filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2017. The Company's 10-Q was signed by Defendant Young and reaffirmed the financial results announced in the press release issued on August 8, 2017. Moreover, the Company indicated in the filing that NUPLAZID contained a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs. The warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia, and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID.

130.  The Company also held a conference call that day during which Defendant Young reiterated the reported financials including net product sales and expenses without revealing that net product sales had been generated in part, by paying off physicians to prescribe NUPLAZID. Moreover, Defendant Davis falsely stated on the call, "So overall, patients are having a positive experience with NUPLAZID. They like the way the drug works. They are tolerating the medication

very well." In reality, Defendants well knew, or were reckless in not knowing, that there were mounting reports of deaths of patients who had been prescribed NUPLAZID, and that they had to pay off physicians to induce them to prescribe this deadly drug.

131. Also on the call, Defendant Yang discussed efforts to generate additional prescriptions of NUPLAZID, stating, in part, "We continue to focus significant effort on working with physicians to identify appropriate new patients… We're still getting new patients every week, every month and moving more those physicians from trial and dabblers into stronger adopters, so a lot more that we can still accomplish." Yang further stated, "We find the drug and the physicians find the drug to be well tolerated and that is overcoming one of the most important elements when we look at our market research," but did not explain that this effort included improper payments to physicians to convince them to prescribe NUPLAZID despite it's troubling safety profile.

132. On November 7, 2017, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Third Quarter 2017 Financial Results." Therein, the Company once again reported on growth and commercialization of NUPLAZID, and reported net product sales of $35.6 million for the three months ended September 30, 2017 compared to $5.3 million for the three months ended September 30, 2016 and $81.3 million in net product sales for the nine months

ended September 30, 2017 as compared to $5.4 million in 2016. The Company also filed its quarterly report with the SEC that day on Form 10-Q for the quarter ended September 30, 2017. The Company's 10-Q was signed by Defendant Young and reaffirmed the financial results announced in the press release issued on November 7, 2017. Moreover, the Company indicated in the filing that NUPLAZID contained a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs. The warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia, and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID.

133.   The same day, the Company held a conference call to discuss its quarterly results during which Defendant Young reiterated the reported financials including net product sales and expenses without revealing that net product sales had been generated in part, by paying off physicians to prescribe NUPLAZID. Moreover, Defendant Davis stated, "On the commercial side, we are seeing important progress on multiple fronts. Access to NUPLAZID remains strong. The feedback from physicians, advocacy groups in the Parkinson's community and patients and caregivers continues to be very positive. We continue to make strong

progress on our promotional efforts for NUPLAZID with increased brand awareness." Defendant further discussed these efforts, stating, "We are working closely with healthcare practitioners to identify appropriate new patients."

134. On February 27, 2018, Acadia announced fourth quarter 2017 NUPLAZID sales of $43.6 million, an increase of 263% as compared to $12.0 million reported for the fourth quarter of 2016. For the year ended December 31, 2017, Acadia reported NUPLAZID net product sales of $124.9 million, an increase of $107.6 million, or 622% from the $17.3 million reported for the year ended December 31, 2016. Acadia also filed its annual report with the SEC on Form 10-K that day for the year ended December 31, 2017. The Company's 10-K was signed by Defendant Davis and reaffirmed the financial results announced in the press release issued on February 27, 2018. Moreover, the Company indicated in the filing that NUPLAZID contained a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs. The warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia, and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID.

135.   In a conference call the same day, Defendant Young reiterated the reported financials including net product sales and expenses without revealing that net product sales had been generated in part, by paying off physicians to prescribe NUPLAZID. Defendant Davis attributed positive revenue results to:

> Continued growth day after day in the number of patients taking NUPLAZID; growth in the number of physicians prescribing NUPLAZID, including at academic centers, and community practices and in long-term care facilities; greater depth with position, that is individual physicians prescribing NUPLAZID to a higher number of their patient; market research results that consistently continue to demonstrate very high levels of physician and patient satisfaction with NUPLAZID, including physician intent to prescribe more; and finally, we continue to enjoy very high levels of access.

136.   Moreover, Defendant Stankovic hyped NUPLAZID's safety profile as compared to other antipsychotic medications, stating, "Pimavanserin also have the favorable tolerability profile. In contrast, other antipsychotic tier significant side effects and tolerability issues." These statements were false because, in reality, there were mounting reports of deaths of patients treated with NUPLAZID.

137.  On April 9, 2018, CNN reported that "[p]hysicians, medical researchers and other experts told CNN that they worried that [NUPLAZID] had been approved too quickly, based on too little evidence that it was safe or effective. And given these mounting reports of deaths, they say that more needs to be done to assess Nuplazid's true risks." In greater part, the article stated:

> Nuplazid's review was being expedited because it had been designated a "breakthrough therapy" -- meaning that it demonstrated

"substantial improvement" in patients with serious or life-threatening diseases compared to treatments already on the market. Congress created this designation in 2012 in an effort to speed up the FDA's approval process, which has long been criticized for being too slow. Around 200 drugs have been granted this designation since its creation.

Still, to recommend approval, the advisory committee would have to find that the drug's potential benefits outweighed its risks for its intended patients.

Some FDA officials concluded that Nuplazid's public health benefit was enough to merit approval of the drug. Their argument echoed the pleas of family members and caregivers like Tyne: It could possibly help patients with no other alternative. Several of the people who spoke said their loved ones had been transformed during the clinical trials, though some said there was no way for them to know whether they were on Nuplazid or a placebo.

But the physician who led the FDA's medical review, Dr. Paul Andreason, warned that patients taking the drug during the company's clinical trials experienced serious outcomes, including death, at more than double the rate of those taking the placebo. The company's limited testing, he said, had not convinced him that the benefits outweighed the risks.

While Tyne had heard about these risks, he said he "discounted death as a real statistical possibility" and was willing to try anything to help his mother.

"I have two young children who love their grandmother," he told the committee. "If nothing is done to bring her back to some semblance of normalcy, my children will never remember their grandmother for who she is: a loving, funny, caring woman who has improved the lives of all of the loved ones who surround her. Please, I beg you, do not deprive my children and their grandmother of experiencing that love."

'You have to take it seriously'

The committee voted 12-2 and recommended that the FDA approve Nuplazid for the treatment of Parkinson's disease psychosis based on a six-week study of about 200 patients. Three previous studies of the drug did not show that it was effective, Andreason said in his medical review, though they showed similar risk.

Even some committee members who voted in favor of the drug expressed reservations, according to the hearing transcript. "I guess I'm hoping that the risks are going to be small, and I think the benefits for some of these people who are very sick and whose families are affected by this, I think they're probably willing to take that risk," one physician stated. Another committee member said she wouldn't have voted for the drug's approval if there had been a safe and effective alternative on the market. A third made a "plea" to the FDA to "consider a large observational study so we can ensure that, once it goes into real-world use, that the benefits will outweigh the risks."

It hit the market in June 2016. As caregivers and family members rushed to get their loved ones on it, sales climbed to roughly $125 million in 2017.

Tyne got his mother on the drug as soon as it became available. But after trying it for months, he says he was devastated to see that it was doing nothing to halt the awful progression of the disease, and her hallucinations became more frequent and harder to manage. "She has gone straight downhill to the point she really can't function at all," he said.

Shortly after the drug's release, patients' family members, doctors and other health care professionals started reporting "adverse events" possibly linked to the medication -- including deaths, life-threatening incidents, falls, insomnia, nausea and fatigue. In more than 1,000 reports, patients continued to experience hallucinations while on Nuplazid.

In November, an analysis released by a nonprofit health care organization, the Institute for Safe Medication Practices, warned that 244 deaths had been reported to the FDA between the drug's launch and March 2017. The organization also noted that hundreds of reports

suggested the drug was "not providing the expected benefit" or potentially worsening the condition.

Tracked by the FDA, these so-called "adverse event reports" document deaths, side effects and other issues, and can be made directly by consumers, caregivers and other medical professionals. Reports are submitted to either the FDA or to the drugmaker, which is required to pass along any it receives to the federal government. In some cases, the person filing the report is convinced the side effects were caused by the drug; in others, the reporter ascribes no cause but notes that the patient was on the drug.

An adverse event report does not mean that a suspected medication has been ruled the cause of harm and is typically not the result of an official investigation. But the FDA uses the information to monitor potential issues with a drug and can take action as needed -- updating a medication's label, for instance, or restricting its use or pulling it off the market.

After analyzing the adverse event data for Nuplazid, the Institute for Safe Medication Practices concluded that this batch of reports "reinforces the concerns of those who warned that (Nuplazid) might do more harm than good." Thomas Moore, senior scientist for drug safety and policy for the nonprofit, said the deaths are an "important warning signal" and warrant further review by the FDA -- and possible action, depending on what the review finds.

Since the institute released its analysis, FDA data shows that the number of reported deaths has risen to more than 700. As of last June, Nuplazid was the only medication listed as "suspect" in at least 500 of the death reports.

Physicians, medical researchers and other experts told CNN that they worried that the drug had been approved too quickly, based on too little evidence that it was safe or effective. And given these mounting reports of deaths, they say that more needs to be done to assess Nuplazid's true risks.

"This is almost unheard of, to have this many deaths reported," said Diana Zuckerman, founder and president of the nonprofit think tank

the National Center for Health Research, adding that because reports are voluntary, potential problems may be underreported. "You just don't see this with most new drugs -- you don't see all these reports -- so you have to take it seriously."

138.   On this news, Acadia's stock price fell $5.03 per share, or 23.4%, to close at $16.50 per share on April 9, 2018, on unusually heavy trading volume.

139.   On April 10, 2018, Acadia issued a press release entitled "Acadia Statement Regarding the Efficacy and Safety of NUPLAZID." Therein, the Company stated:

> *The safety of patients has always been, and continues to be Acadia's top priority*. NUPLAZID® was approved by the FDA for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis (PDP) based on a pivotal Phase 3 study and other supportive studies that demonstrate its efficacy and safety. The clinical development program for NUPLAZID involved 25 clinical studies in greater than 1,200 patients, comprising over 600 PDP patients (with approximately 170 patients treated for at least two years), thus presenting the largest clinical safety database in PDP patients to date. We continually analyze new data to ensure the safety of NUPLAZID and the ongoing evaluation has revealed no change in the benefit/risk profile described in the NUPLAZID Prescribing Information.
>
> Approximately one million people in the United States live with Parkinson's disease. More than 50 percent of them will experience PDP symptoms over the course of the disease. As the only drug currently approved by the FDA for the treatment of hallucinations and delusions associated with PDP, NUPLAZID is filling an important and previously unmet need and offers hope to those with PDP and the people who care for them. *We remain confident in the efficacy and safety of NUPLAZID that supported its approval by the FDA and stand firmly behind it*.

140.   On April 25, 2018, CNN reported that the FDA was re-examining the

safety of NUPLAZID. In greater part, the article stated:

The Food and Drug Administration says it is re-examining the safety of a medication that was approved despite concerns that not enough was known about the drug's risks.

In response to questioning at a budget hearing last week, FDA Commissioner Scott Gottlieb told members of Congress that he would "take another look" at Nuplazid, which is the only drug approved to treat hallucinations and delusions associated with Parkinson's disease psychosis. The medication has been cited as a so-called "suspect" medication in hundreds of deaths voluntarily reported by caregivers, doctors and other medical professionals since it hit the market, as highlighted in a recent CNN report.

The FDA told CNN this week that the agency had already begun conducting a new evaluation of the medication when Gottlieb was questioned about it at the hearing. The agency said the review had started several weeks ago.

"What does it take for a drug like this to be taken off the market?" asked US Rep. Rosa DeLauro, a member and former chair of the congressional subcommittee responsible for funding and overseeing the FDA.

DeLauro pressed Gottlieb for answers on his agency's response to the safety concerns surrounding Nuplazid.

"How many more adverse events do we have to have reported? How many people, quite frankly, have to die? Why does the industry always take precedence over public health and safety?"

Tracked by the FDA, the adverse event reports cited by DeLauro do not mean that a suspected medication has been ruled the cause of harm and are typically not the result of official investigations. But the FDA uses the information to monitor potential issues with a drug and can take action as needed: updating a medication's label, for instance,

or restricting its use. In rare cases, the agency can even pull a drug off the market.

When asked by CNN about what prompted the FDA's new evaluation of Nuplazid, the agency said the decision was based on a number of factors but wouldn't say what those factors were. Instead, it would only comment generally, saying that it identifies "potential signals of serious risk/new safety information" in part by using adverse event data and that the agency is not suggesting physicians stop prescribing the drug or take patients off of it while a safety evaluation is taking place.

The FDA has noted that the death reports citing Nuplazid have typically involved elderly patients with advanced-stage Parkinson's disease who suffered from numerous medical conditions and often take other medications that can increase the risk of death.

But physicians, researchers and other medical experts told CNN that the high number of reports deserved a closer look to determine whether they were related to the drug. They also recommended further testing of Nuplazid, worrying that the drug had been approved too quickly, based on too little evidence that it was safe or effective.

141. On this news, Acadia's stock price fell $4.27 per share, or 21.9%, to close at $15.20 per share on April 25, 2018, on unusually heavy trading volume.

142. On April 27, 2018, Acadia published a statement entitled "Acadia Pharmaceuticals Issues Statement Reaffirming Benefit/Risk Profile of NUPLAZID." Therein, the Company, in relevant part, stated:

NUPLAZID® (pimavanserin) is the only medicine approved in the United States to treat hallucinations and delusions associated with Parkinson's disease psychosis. NUPLAZID was approved by the FDA based on a pivotal Phase 3 study that demonstrated clinically robust and highly statistically significant efficacy, combined with other supportive studies. *We are confident in NUPLAZID's efficacy and positive benefit/risk profile and stand firmly behind it*.

***Acadia's top priority has been, and continues to be, patient safety***. NUPLAZID was approved and launched in 2016. As the manufacturer of a newly launched drug, we are routinely in contact with the FDA regarding requests for additional information on NUPLAZID, including postmarketing safety surveillance information as part of the FDA's ongoing safety monitoring.

In a statement released to the media on April 10, 2018, the FDA stated, "The FDA continues to monitor adverse events reported with NUPLAZID that are submitted to the FDA Adverse Event Reporting System (FAERS). We have noted that the cases typically involve geriatric patients with advanced-stage Parkinson's disease, as well as numerous medical conditions, who are frequently taking concomitant medications with risks for serious adverse events, including death. Based on these data, the FDA has, at this time, not identified a specific safety issue that is not already adequately described in the product labeling."

On April 25, 2018, the FDA stated that its evaluation does not mean the Agency has determined the medicine has a new risk and does not suggest healthcare providers should not prescribe it nor that patients should stop taking the medication. The Agency also has confirmed this statement does not represent a change from the safety review and monitoring activities the FDA referred to in its statement of April 10. As always, we will continue to work with the FDA and medical community to answer any questions related to NUPLAZID.

Acadia collects and analyzes postmarketing events for NUPLAZID as part of our ongoing commitment to monitor the medication's safety profile. These events are submitted to the FDA and incorporated into the FDA's FAERS public reporting system. Because NUPLAZID is distributed through a specialty distribution channel, we have frequent (in most cases monthly) contact with patients and caregivers through our distribution partners. This increased interaction naturally results in dramatically higher adverse event collection and reporting compared to products without such a distribution method. Approximately 93 percent of the reported adverse events associated with NUPLAZID are considered "solicited" due to this direct interaction with patients and caregivers, while only approximately 7 percent of these events are

considered "spontaneous" reports, which are voluntary reports originating from consumers or healthcare professionals. In contrast, most other antipsychotics are distributed through retail channels, which rely almost entirely on "spontaneous" reporting. Consequently, only a small fraction of actual adverse events are collected for these drugs.

143.   While disclosing their admitted awareness of all adverse event reports, the Company still hid the fact that as a result of this knowledge of mounting deaths and adverse events, Acadia's commercialization efforts during the Relevant Period included payouts to physicians to induce them to prescribe NUPLAZID as opposed to other off-label alternatives, which raised a risk that Acadia would face regulatory scrutiny.

144.   On May 4, 2018, Acadia issued a press release entitled "ACADIA Pharmaceuticals Reports First Quarter 2018 Financial Results." Therein, the Company touted NUPLAZID's "strong performance in the first quarter of 2018" attributing that performance to "Sequential volume growth of 13.5% drove sequential revenue growth of 12% as health care providers and patients continue to experience the benefits of NUPLAZID in treating the symptoms of Parkinson's disease psychosis," according to Defendant Davis. The Company reported net sales of NUPLAZID of $48.9 million for the first quarter of 2018, an increase of 220% as compared to $15.3 million reported for the first quarter of 2017. Also, on May 4, 2018, Acadia filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2016. The Company's 10-Q was signed by Defendant Young and

reaffirmed the financial results announced in the press release issued on May 4, 2018. Moreover, the Company indicated in the filing that NUPLAZID contained a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs. The warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia, and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID.

145.   The same day, the Company held a conference call with analysts during which Defendants Davis and Young reiterated the reported financials including net product sales and expenses without revealing that net product sales had been generated in part, by paying off physicians to prescribe NUPLAZID. Moreover, Defendant Stankovic reiterated Defendants' previous statements regarding NUPLAZID's safety, and confirmed their consistent efforts to stay apprised of safety issues:

> We are confident in NUPLAZID's efficacy and positive risk profile and stand firmly behind it.
>
> Since, approval and launch in 2016, ACADIA has monitored NUPLAZID's safety throughout this period in robust of pharmacovigilance activities. We're also continuously evaluating the benefits and risks of pimavanserin treatment in our ongoing clinical studies, both in placebo-controlled and the open-label long-term safety trials.

Based on this ongoing evaluations and the totality of currently available information, we maintain our assessment that the benefit risk profile for NUPLAZID remains unchanged and it is appropriately described in the product labeling.

146. The above statements identified were materially false and/or misleading, and failed to disclose material adverse fact, including: (i) adverse events, safety concerns, and mounting reports of deaths related to NUPLAZID post-commercialization raised the risk that the FDA would reconsider its approval of the drug or, at minimum, that industry watchdogs would warn against prescribing the drug; (ii) as a result of NUPLAZID's deleterious safety profile and the availability of off-label alternatives, Acadia embarked on a campaign to pay off physicians to prescribe NUPLAZID; (iii) Acadia's reported net product sales throughout the Relevant Period therefore included sales generated by these improper business practices rather than just from the acceptable business practices Defendants described publicly during the Relevant Period; and (iv) these improper business practices, in contravention of federal regulations, raised a risk that Acadia would face regulatory scrutiny.

**The Truth is Revealed**

147. On July 9, 2018, SIRF published a report entitled "Acadia Pharmaceuticals: This Is Not a Pharmaceuticals Company." Therein, SIRF stated that "evidence is mounting that something is horribly wrong with Acadia's sole drug, Nuplazid, an antipsychotic for Parkinson's disease patients who experience

episodic hallucinations and delusions" and that "Acadia has accomplished its growth in ways that have attracted intense regulatory scrutiny for other drug companies" including "dispensing wads of cash to doctors to incentivize prescription writing and downplaying mounting reports of patient deaths."

148.   After detailing NUPLAZID's questionable efficacy results given three busted trials, the lax and expedited approval process NUPLAZID enjoyed given its "Breakthrough Therapy Designation," an admission by the FDA's division director of psychiatry products "that awarding the breakthrough designation hinged on the fact that no other FDA-approved drugs existed for treating Parkinson's disease psychosis, as well as the frequency that these patients were being placed in nursing homes, which he called "a harbinger of death," and Dr. Andreason's scathing recommendation against approval, the SIRF report went to describe the shocking lengths to which Acadia opted to go to ensure physicians prescribed NUPLAZID to their patients, despite the dire mortality rate:

> Over the six months that Nuplazid was commercially available in 2016, Acadia spent $609,556 on consulting, speaking and travel and lodging payments to 1,578 doctors: Pomona, New York, psychiatrist Dr. Leslie Citrome's $25,690 payout amounted to the largest sum, followed by the $19,142 paid to Dr. Khashayar Dashtipour, a Loma Linda, California based neurologist.

> But what a difference a year makes.

> For 2017, Acadia paid more than $8.6 million to 7,051 physicians, with 62 doctors receiving more than $50,000 apiece, and 26 receiving at least $100,000 each.

The leading recipient of Acadia cash last year was Dr. Neal Hermanowicz, an Irvine, California-based movement disorders specialist who took in $180,123, a handsome improvement over 2016's $10,421. The runner up was psychiatrist Dr. Jason Kellogg, of Santa Ana, California, who was paid $166,259. (In contrast, the $25,690 that Dr. Citrome received in 2016, which was the biggest payout for that year, would have ranked as only the 104th largest payment to doctors if it had been given out in 2017.)

Given the fact that Acadia hired a significant number of former Avanir sales staffers, a substantial number of doctors have ended up receiving consulting payments from both Avanir and Acadia in the same calendar year: A total of 31 did in 2017, as did 29 in 2016. Out of that group, a dozen doctors took in $5,000 apiece or more from the two companies in 2017. Just six did in 2016.

Acadia's payments in 2017, according to the Centers for Medicare and Medicaid Services' Open Payments database, were almost entirely for consulting, save $522,935 for food and beverage expenses. (Other payment categories the centers track include "honorariums," such as fees for lecturing to other medical professionals, or "education," when the company covers the expense of distributing a journal article or staging a presentation at a conference.) Despite Acadia's discussions about supporting research on Nuplazid, the company's appetite for external or independent research sharply declined last year. It spent just $197,587 on doctors' research projects, in contrast with its $817,613 outlay in 2016. (Avanir went in the other direction, devoting $7.61 million to research last year and $4.36 million to payments to doctors.)

Since Acadia doesn't release Nuplazid's prescription count, Medicare Part D data is the only way to observe prescriber behavior. To that end, overlaying Medicare Part D prescription volume from 2016 (the latest period for which data is available) against the Centers for Medicare and Medicaid Services Open Payments data for 2016 and 2017 illuminates a few things.

There's a good deal of overlap between those who received Acadia consulting fee payments in 2016 and 2017 and the individuals who

prescribed Nuplazid with some frequency in 2016. For instance, in 2016, 14 of the 25 most frequent prescribers of Nuplazid to patients covered by Medicaid Part D received "consulting fees" in 2017 worth more than $1.21 million in total.

Almost 37 percent of Acadia's $1.21 million in consulting fee payments, or $443,014, went to three neurologists who conducted Acadia-funded studies on Nuplazid and published journal articles about their findings: Dr. Neal Hermanowicz; Dr. Stuart Hal Isaacson of Boca Raton, Florida; and Dr. Rajesh Pahwa of Kansas City, Kansas.

Pittsburgh-based Dr. Susan Baser, a leading prescriber of Nuplazid to patients paying for it via Medicaid Part D, told the Southern Investigative Reporting Foundation, "It's the only drug addressing [Parkinson's disease psychosis] and we've had positive effects in some patients." She added, "Personally I think it's a good drug despite the noise about adverse events that's out there."

Baser, who did not receive any consulting fees from Acadia in 2016 and 2017, expressed surprise at the size of the payments that some of her peers received from the company. "I work 60 hours per week. I don't know how they have the time. I'm just too busy for any of that."

149.   On this news, Acadia's stock price fell $1.21 per share, or 6.8%, to close at $16.63 per share on July 9, 2018, on unusually heavy trading volume.

150.   Post-Relevant Period, on November 28, 2018, the Company filed a prospectus supplement on Form 424B5. Buried within that filing, the Company included a single sentence revealing that two months prior, in September 2018, Acadia "received a civil investigative demand, or CID, from the DOJ pursuant to the Federal False Claims Act requesting certain documents and information related

to our sales and marketing of NUPLAZID." The DOJ's investigation is still ongoing.

151.   Moreover, on March 27, 2019, the Institute for Safe Medication Practices ("ISMP") issued a report which called upon the FDA to reevaluate the drug, or at minimum, revise NUPLAZID's confusing black box warning. Highlighting frightening safety signals, the ISMP noted that in the prior 12 months there had been 43,781 reports of patient deaths, a number that surpassed the number of deaths for all motor vehicle accidents in 2017 and twice as many as for all homicides.

## The Securities Class Action Survives the Motion to Dismiss

152.   On June 1, 2020, the court in the Securities Class Action denied defendants' motion to dismiss in part.

153.   In so deciding, the court noted that plaintiffs have alleged sufficient facts to display that certain statements were false and/or misleading, including, but not limited to a failure to disclose kickback payments to physicians to prescribe NUPLAZID and a failure to disclose reports of death in patients taking NUPLAZID.   In addition, the court found that plaintiffs had successfully alleged facts to support scienter.

## DAMAGES TO ACADIA

154.   As a result of the Individual Defendants' wrongful conduct, Acadia disseminated false and misleading statements, and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Acadia's credibility. Acadia has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

155.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Acadia's market capitalization has been substantially damaged, having lost millions of dollars in value as a result of the conduct described herein.

156.   Further, as a direct and proximate result of the Individual Defendants' conduct, Acadia has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending Acadia and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b) costs incurred from the DOJ investigation;

(c) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Acadia's artificially inflated stock price; and

(d) the improper payments made following NUPLAZID's launch as described herein. Specifically, during the six months of 2016, Acadia spent $609,556 on consulting, speaking and travel and lodging payments with payments to individual doctors as large as $25,690 and $19,145. In 2017, Acadia paid more than $8.6 million, with 62 doctors receiving more than $50,000 apiece, and 26 receiving at least $100,000 each.

157. Moreover, these actions have irreparably damaged Acadia's corporate image and goodwill. For at least the foreseeable future, Acadia will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Acadia's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

158. Plaintiff brings this action derivatively in the right and for the benefit of Acadia to redress injuries suffered, and to be suffered, by Acadia as a direct result of the violations asserted herein by the Defendants. Acadia is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

159.   The Board of Acadia, at the time this action was commenced, consisted of Defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland, a total of seven (7) individuals.

160.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Acadia Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

## Demand is Futile as to Defendant Davis Because His Principal Professional Occupation as the Company's CEO

161.   Defendant Davis is the Company's CEO and a member of the Company's Board of Directors.  In his role as CEO of the Company for the fiscal years 2016, 2017, 2018, and 2019 Defendant Davis received $9,261,447, $15,158,146, $6,508,032, and $7,631,245 in total compensation respectively.  The Company does not claim that Defendant Davis is an independent director and because his primary source of income and primary employment is his employment as CEO of Acadia and his professional reputation is inextricably bound to his role at Acadia, Defendant Davis is incapable of acting independently and demand is futile upon him.

## Demand is Futile as to the Audit Committee Defendants

162. Demand is futile as to Defendants Brege, Soland, and Daly (collectively, the "Audit Committee Defendants") as the members of the Audit Committee for their knowing failure to fulfill their responsibilities. As stated above, the Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.

163. Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

164. The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the Company's failure to disclose kickback payments to physicians to prescribe NUPLAZID and a failure to disclose reports of death in patients taking NUPLAZID. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability

so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

### Demand is Futile Because a Majority of the Board Could Not Have Exercised Disinterested and Independent Business Judgment in Considering a Demand

165.  Demand is excused because more than half of the Company's current Board of Directors face a substantial likelihood of personal liability in connection with the above misconduct.

166.  The Board of Acadia, at the time this action was commenced, consisted of Defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland, a total of seven (7) individuals.

167.  Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

168.  Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the

Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

169.  In addition, as set forth above, by way of their respective roles in the Company, Defendants Biggar, Baker, Brege, Daly, Davis, Harrigan, and Soland, were able to, and did, determine the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period.

170.  Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

### Against the Individual Defendants for Contribution Under Section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act

171.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172.  As a result of the conduct and events alleged above, Acadia has been named as a defendant in the Securities Class Action brought on behalf of Acadia shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

173.  Federal law provides Acadia with a cause of action against other

alleged joint tortfeasors under Rule 10b-5.   In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Acadia has a federal law right of contribution against joint tortfeasors under Rule 10b-5.   Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Acadia to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Securities Class Action, and sets forth specific rules regarding the determination of claims for such contribution.

174.   Accordingly, Plaintiff, on behalf of Acadia, hereby claims contribution against the Individual Defendants, each of whom has been named in the currently pending Securities Class Action as a joint tortfeasor with Acadia under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Acadia.

175.   Acadia claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

## **Allegations Regarding the Individual Defendants**

176.   Throughout the Relevant Period, the Individual Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's NUPLAZID drug product.   These statements were materially

84

misleading to persons who purchased Acadia securities during the Relevant Period. In particular, the SEC filings and other public statements created the false impression that, *inter alia*, the Company's NUPLAZID drug product was safe, when instead, the Individual Defendants failed to disclose that: (i) adverse events, safety concerns, and mounting reports of deaths related to NUPLAZID post-commercialization raised the risk that the FDA would reconsider its approval of the drug or, at minimum, that industry watchdogs would warn against prescribing the drug; (ii) as a result of NUPLAZID's deleterious safety profile and the availability of off-label alternatives, Acadia embarked on a campaign to pay off physicians to prescribe NUPLAZID; (iii) Acadia's reported net product sales throughout the Relevant Period therefore included sales generated, at least in part, by undisclosed improper business practices rather than just from the acceptable business practices Defendants described publicly during the Relevant Period; and (iv) these improper business practices, in contravention of federal regulations, raised a risk that Acadia would face regulatory scrutiny.

177.   The plaintiffs in the Securities Class Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Acadia securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

178.   The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

179.   The plaintiffs in the Securities Class Action were unaware of the false and misleading nature of said statements and omissive disclosures.

180.   When the Individual Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of Acadia, the Individual Defendants were privy to information regarding the Company's financial prospects and internal controls, and would have been well aware the ongoing issues at the Company.

181.   Accordingly, the Individual Defendants are liable for damages under Section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Acadia were to be held liable in the Securities Class Action, the Individual Defendants would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of Acadia.

### Allegations Regarding the Individual Defendants as Control Persons

182.   In acting as alleged above, the Individual Defendants were acting as

authorized agents of Acadia in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

183.   The Individual Defendants were "controlling persons" of Acadia within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Individual Defendants could be held liable to the plaintiffs in the Securities Class Action.  Were the Company to be held liable in said Securities Class Action, the Individual Defendants would be liable to it for contribution.

## COUNT II

### Against the Individual Defendants for Breaches of Fiduciary Duty

184.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.   The Individual Defendants owed and owe Acadia fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants, owed and owe Acadia the highest obligation of good faith, loyalty, and due care.

186.   The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Acadia shareholders materially misleading and inaccurate

information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

187.   During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Acadia to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Acadia and its shareholders.   As a result, the Individual Defendants grossly mismanaged the Company.

188.   As a direct and proximate result of their failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189.   Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

190.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Acadia.

192.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Acadia.

193.   Plaintiff, as a shareholder and representative of Acadia, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

194.   Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## COUNT IV

## Against the Individual Defendants for Waste of Corporate Assets

195.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

196.   As a result of the Individual Defendants' wrongdoing, including by failing to conduct proper supervision, they have caused ACADIA to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

197.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

198.   Plaintiff, on behalf of ACADIA, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Acadia and that Plaintiff is an adequate representative of the Company

B.      Determining and awarding to Acadia the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.      Directing Acadia to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Acadia and its shareholders from a repeat of the damaging events described herein, including but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's controls concerning compliance with the FCA and Anti-Kickback Statute;

- a provision to permit shareholders of Acadia to nominate a majority of the candidates for election to the Board;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Acadia's directors, executives, and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

D.    Awarding to Acadia restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 23, 2020                    Respectfully submitted,

                                        **COOCH AND TAYLOR P.A.**

                                        */s/ Blake A. Bennett*
                                        Blake A. Bennett (#5133)
                                        The Nemours Building

1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
(302) 984-3800

OF COUNSEL:
Joshua M. Lifshitz
**LIFSHITZ LAW FIRM, P.C.**
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
*Attorneys for Plaintiff*